# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) Criminal No. 15-87 |
| | ) Judge Nora Barry Fischer |
| SHAWN ATKINS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court are Defendant Shawn Atkins' Motion for Detention Hearing seeking *de novo* review of the Order of Pretrial Detention and his release on bond and the Government's opposition thereto. (Docket Nos. 549, 575). Defendant was ordered detained at the conclusion of a detention hearing before U.S. Magistrate Judge Robert C. Mitchell on July 2, 2015. (Docket Nos. 511-512, 625). Defendant's Motion is granted to the extent that this Court has undertaken a *de novo* review of the Order of Pretrial Detention and considered the transcript of the proceedings before Magistrate Judge Mitchell and the evidence presented at that time, including witness testimony and the Bond Report produced by Pretrial Services. (Docket No. 625). However, after careful consideration of the parties' arguments and all of the evidence of record, Defendant's Motion is denied to the extent that he seeks reversal of the Order on Pretrial Detention and release on bail.

### II. BACKGROUND

Defendant is one of thirty-eight codefendants charged in a multi-count Indictment with, among other charges, conspiracy to distribute and possess with intent to distribute significant amounts of heroin. (Docket No. 3). Specifically, Defendant is charged with: one count of

conspiracy to distribute and possess with intent to distribute more than 1 kilogram of heroin, from in and around January 2014 to in and around April 2015, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i) and 846 (Count 1); and three counts of possession with intent to distribute and distribution of heroin on June 2, 2014, (Count 32); June 4, 2014, (Count 33); and August 8, 2014, (Count 44), in violation of 21 U.S.C §§ 841(a)(1) and 841(b)(1)(C). (*Id.*). The potential penalties for such violations include a sentence of not less than ten years' imprisonment and up to a term of life imprisonment at Count 1, *see* 21 U.S.C. § 841(b)(1)(A)(i), and a term of imprisonment of up to twenty years at Counts 32, 33 and 44, *see* 21 U.S.C. § 841(b)(1)(C).

This case is the result of a DEA investigation into interstate heroin trafficking by a number of individuals in the areas in and around the Pittsburgh neighborhoods of Beltzhoover, Knoxville, Arlington and Allentown which was allegedly headed by lead defendant Lance Gardenhire and other members of the "Zhoove" gang. (*See* Docket Nos. 575, 625). The investigative methods utilized by law enforcement included, among other things, Title III authorized interceptions; search warrants; visual surveillance; traffic stops and arrests of certain defendants; and controlled purchases of heroin from certain defendants. (Docket Nos. 510, 575, 625). The Government alleges that Defendant sold heroin to undercover law enforcement officers on June 2, 2014; June 4, 2014; and August 8, 2014, misconduct which supports the charges at Counts 32, 33 and 34. (*Id.*).

Relevant here, the sealed Indictment was returned by the grand jury on April 28, 2015. (Docket No. 3). Arrest warrants were obtained by the Government for all of the Defendants on May 18, 2015. (Docket Nos. 5, 6). The Government then moved to unseal the Indictment on May 21, 2015, reporting to the Court that all but two of the charged codefendants had been arrested and/or were already incarcerated at that time. (Docket No. 45). The Government stated

in such filing that its efforts to locate those two individuals were ongoing and that these individuals were likely aware of the Government's efforts to secure their arrests at the time. (*Id.*). The Court granted the Motion to unseal shortly thereafter. (Docket No. 46).

The Government did not reveal in its filings the two individuals who had not yet been arrested, but one of those individuals is the instant Defendant, Shawn Atkins. More than a month later, on June 25, 2015, Deputy Marshal Michael Namey effectuated Defendant's arrest, after he was located during a visit to his mother's home in the Crafton Heights neighborhood of Pittsburgh. (Docket No. 625 at 5). According to Deputy Marshal Namey, upon his arrest, Defendant admitted that he was aware that he was wanted during the prior five weeks after the Indictment was unsealed but he claimed that he did not know how to turn himself in to the authorities.[1] (*Id.*). It is also uncontested that Defendant was aware that his brother, Kevin Scott, was similarly charged in the Indictment and that he had been previously arrested and detained at the Allegheny County Jail on state charges that formed the basis for the instant federal prosecution. (*Id.* at 5, 15). Hence, Scott was in custody when the Indictment was unsealed and was later transported to federal court via a writ of habeas corpus ad prosequendum to respond to the charges in this case, making his initial appearance on June 9, 2015.[2] (Docket Nos. 319, 348).

Magistrate Judge Mitchell and the parties also had the benefit of the Pretrial Bond Report produced by the U.S. Probation Office after interviewing Defendant and to which no objections were lodged at the hearing. (*See Bond Report dated 6/25/15*; Docket No. 625 at 4). This report

---

[1] Deputy Marshal Namey did not testify at the hearing although he was present at that proceeding. (Docket No. 625 at 5). Instead, Deputy Namey's statement was presented by way of proffer by Government counsel and offered for cross-examination, an invitation which was declined by Defendant through his counsel. (*Id.*).

[2] Scott waived his detention hearing and remains in custody of the United States Marshal Service. (Docket Nos. 391-392). The charges against him include: Count 1, conspiracy to distribute more than one kilogram of heroin, in violation of 18 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i) and 846; Count 18, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); Count 25, possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and, Count 48, possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

3

reveals that Defendant: is now 22 years old; is a high school graduate, without any additional training or education; and, was unemployed for a period of 1 year prior to the hearing, working only "under the table" at a barber shop and helping out with his father's cleaning business when needed. (*See Bond Report dated 6/25/15*). Defendant's criminal history includes: an arrest on a prior robbery case in 2010 for which he was acquitted; guilty pleas to charges of disorderly conduct and possession of a small amount of marijuana in 2012, for which he was fined and court costs were imposed; and, a guilty plea to misdemeanor charge of possession of a controlled substance to which he was sentenced to 6 months' probation on January 28, 2014. (*Id.*). Based on this summation, it appears that Defendant was on probation in the state system at the times when he allegedly sold heroin to undercover law enforcement officers on June 2, 2014 and June 4, 2014 but that this term of probation likely expired a week or so prior to the heroin sale on August 8, 2014.

At the detention hearing before Magistrate Judge Mitchell, Defendant presented the testimony of his girlfriend, Megan Maxsin, and his father, John Atkins, ("Mr. Atkins"), and each were subject to cross-examination. (Docket No. 625). Defendant's mother, Angela Pearson, was also present at the hearing, arriving late, but Defendant declined Magistrate Judge Mitchell's invitation to have her testify as well. (*Id.* at 25). It is undisputed that Mr. Atkins and Ms. Pearson are separated, do not live together and have maintained separate households for around 2 years. (*Id.* at 20). Both Ms. Maxsin and Mr. Atkins admitted that they were aware that Defendant had been indicted around May 21, 2015, informing the Court that they learned of this information from news reports in the Post-Gazette, unidentified Facebook posts, and general rumors they heard from others in the area. (*Id.* at 14, 24). Ms. Maxsin claimed that she and Defendant believed that there was no warrant issued for his arrest, testifying that she had

contacted a few attorneys after conducting a Google search – whose last names she recalled as either "Garcia" or Carsia" – and an attorney named "Kevin" who was representing Defendant's brother but that the attorneys advised that there was no warrant for Defendant's arrest.[3] (*Id.* at 14-19). Defendant presented no evidence to corroborate that these phone calls were made or that the specific advice was received from these lawyers, and Mr. Atkins denied that he was aware that any such contacts to lawyers had been made. (*Id.* at 22-23). Ms. Maxsin further testified that they did not contact any law enforcement agencies such as the Pittsburgh Police or Allegheny County Sheriff's Office to determine if a warrant was outstanding for Defendant's arrest. (*Id.* at 16).

As to Defendant's whereabouts during the period between the unsealing of the Indictment on May 21, 2015 and Defendant's arrest on June 25, 2015, Ms. Maxsin testified that she and Defendant had been living together – along with her four year old son – in her Crafton Heights residence since around the time they started dating in November of 2014 but that before that time Defendant had previously lived with his mother at a residence on Warrington Avenue in the Allentown neighborhood of Pittsburgh. (*Id.* at 17-18). She explained that Ms. Pearson and her sons moved to Crafton Heights because the house they were previously living in was "messed up," denying the prosecutor's suggestion that the move was precipitated by violence in the area and drug sales that may have occurred near the residence. (*Id.* at 18). Ms. Maxsin advised that she was in school part time and that Defendant's brothers watched her son when she was at class. (*Id.* at 13). Mr. Atkins testified that he had almost daily contact with his son during the relevant period because he had been working for his cleaning business, Atkins Commercial Cleaning, on

---

[3] The Court notes that it was not established during the hearing but it appears that Ms. Maxsin was possibly referring to Bruce Carsia, Esquire and Kevin Abramovitz, Esquire, both of whom are local criminal defense attorneys that have appeared before the Court in the past. Indeed, Mr. Abramovitz is listed as counsel for Kevin Scott on the state court docket for the underlying charges against him, although he is not defending Mr. Scott in this federal case. *See Comm. v. Kevin Scott*, CP-02-CR-0016596-2014 (C.P. Allghy 2014).

Mondays, Wednesdays, Thursdays and Fridays. (*Id.* at 21). He denied that his son was hiding from authorities, explaining that he was working openly on cleaning jobs at Ulta beauty salons in the Robinson, Cranberry and Washington areas. (*Id.* at 23). Mr. Atkins explained that he was willing to keep his son busy with employment if he were permitted to be released on bond. (*Id.*). Ms. Maxsin testified that she would be willing to permit Defendant to reside at her home and to watch her son while she was attending classes four days a week from 9:00 a.m. to 1:00 p.m. (*Id.* at 12).

The attorneys argued their respective positions on the issue of detention to Magistrate Judge Mitchell, who held that Defendant would be detained pending trial, thereby rejecting Defendant's proposal that he reside with Ms. Maxsin and her son, on electronic monitoring and home detention during pretrial proceedings and trial.[4] (Docket Nos. 612; 625). Defendant filed the pending Motion on July 6, 2015. (Docket No. 549). The Government submitted its Response in opposition on July 17, 2015. (Docket No. 575). Thereafter, the Court authorized the production of the official transcript of the proceedings before Magistrate Judge Mitchell and the same was filed of record by the official court reporter on August 12, 2015. (Docket No. 625). The parties have not requested the opportunity to submit additional briefs on this matter. Accordingly, Defendant's Motion is now ripe for disposition and the Court sets forth the following in support of its decision to affirm the pretrial detention order in this case.

III. LEGAL STANDARD

A District Judge reviews the decision of the U.S. Magistrate Judge granting or denying bail *de novo*. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). The Court retains the

---

[4] Pretrial Services initially recommended that Defendant should be released to live with his mother, Ms. Pearson, and subject to strict conditions of release. (*See Bond Report*). Neither party called the Pretrial Services representative to testify at the hearing. (*See* Docket No. 625). For reasons set forth herein, the Court does not believe that the applicable presumption of detention has been rebutted; hence, there is no reason to further develop this potential alternative for release.

discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record. *See e.g.,* 18 U.S.C. § 3142(f)(2)(B); *United States v. Burgess*, 2009 WL 2038148, at *2 (W.D. Pa. Jul. 9, 2009). However, when the record is fully developed below, and the parties have not proffered any additional evidence which would materially alter the decision of the Magistrate Judge, as is the case here, the Court will rule on the record established before the Magistrate Judge. *See United States v. Ewell*, Crim. No. 13-125, 2013 WL 4479029, at *1 (W.D. Pa. Aug. 20, 2013).

IV. DISCUSSION

The parties do not dispute Magistrate Judge Mitchell's finding that a rebuttable presumption of detention arises in this case given the grand jury's return of an Indictment setting forth a charge against Defendant that he has committed an offense for which the maximum sentence is life imprisonment and/or a violation of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, for which the authorized statutory penalty exceeds a term of incarceration of more than 10 years. (Docket Nos. 549, 575, 625). This Court agrees that the presumption of detention applies given that Defendant has been charged with one count of conspiracy to possess with intent to distribute and to distribute heroin contrary to the provisions of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i) and in violation of 21 U.S.C. § 846 and three additional counts of possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Docket No. 3). The grand jury's return of the Indictment suffices to demonstrate probable cause that these offenses were committed, *see United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986), and the potential penalties for the violation at Count 1 includes a statutory minimum sentence of 10 years and up to a term of life imprisonment, *see* 21 U.S.C.

7

§§ 841(a)(1), 841(b)(1)(A)(i), 846. Therefore, pursuant to 18 U.S.C. § 3142(e)(3), a rebuttable presumption has been established that no condition or combination of conditions will reasonably assure the appearance of Defendant as required and reasonably assure the safety of the community from the commission of further crimes by this Defendant. *See* 18 U.S.C. § 3142(e)(3).

The parties dispute the ultimate finding of detention by Magistrate Judge Mitchell and his evaluation of the evidence presented at the detention hearing. (Docket Nos. 512, 549, 575, 625). The relevant legal principles on these contested issues follow.

When the presumption of detention arises, the burden shifts to Defendant to produce some credible evidence that he will appear and will not present a threat to the community. *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). If Defendant makes such a showing, the burden then returns to the Government to demonstrate by clear and convincing evidence that Defendant is a danger to the community and/or by a preponderance of the evidence that Defendant is a flight risk. *See United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1986) ("The clear and convincing standard does not even operate until the defendant has come forward with some evidence of lack of dangerousness."). In making its determination of whether there are conditions of release that will reasonably assure the appearance of Defendant as required and the safety of any other person and the community, the Court must weigh the evidence in light of the factors set forth in 18 U.S.C. § 3142(g), i.e.:

> (1) the nature and circumstances of the offense charged […];
> 
> (2) the weight of the evidence against the person;
> 
> (3) the history and characteristics of the person, including--
> 
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of

8

> residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). Section 3142(e) provides that if a "judicial officer finds that no condition or combination of conditions [of pretrial release] will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

After careful consideration of all the evidence of record, and the arguments of counsel in light of these governing legal principles, the Court finds that, on balance, the evidence presented at the detention hearing before Magistrate Judge Mitchell favors the government on the majority of these factors and that the Government has met its burden to demonstrate that pretrial detention is appropriate. Accordingly, the Court affirms the decision of Magistrate Judge Mitchell ordering that Defendant be detained pending trial. The Court now turns to its evaluation of the evidence on the contested legal points.

### A. Nature and Circumstance of Offense Charged and Weight of Evidence

As to the first and second factors, this case involves serious charges that Defendant participated in an interstate conspiracy to distribute more than 1 kilogram of heroin – a very dangerous and addictive Schedule I narcotic – throughout the Pittsburgh area. (Docket No. 3). While the Court recognizes that Defendant is presumed innocent of the charged offenses, *see* 18 U.S.C. 3142(j), the Court finds that the weight of the evidence against Defendant appears strong

based on the uncontested evidence presented by the Government indicating that he sold heroin to undercover officers on three different occasions in the summer of 2014, during the pendency of the charged conspiracy which allegedly operated between January of 2014 and April of 2015. (Docket No. 625 at 5). Certainly, eyewitness testimony from a law enforcement officer that he or she purchased heroin directly from Defendant on three different occasions may be sufficient to convict him of the possession/distribution charges. *See United States v. Steptoe*, 126 F. App'x 47, n.1 (3d Cir. 2005) (citing *United States v. Perez*, 280 F.3d 318, 344 (3d Cir. 2002)) ("The testimony of one uncorroborated witness is sufficient to convict."). The controlled buys also constitute strong evidence of Defendant's knowing participation in the conspiracy charged at Count 1. *See United States v. Maynard*, 586 F. App'x 56, 59 (3d Cir. 2015).

In short, there is significant evidence that Defendant was not only involved in the drug sales charged at Counts 32, 33 and 44 but also of the conspiracy charged at Count 1.

*B. History and Characteristics of Defendant*

The Court next considers Defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" under section 3142(g)(3)(A).

Defendant is twenty-two (22) years old. (*See Bond Report*). He is a lifelong resident of Pittsburgh. *Id.* He is unmarried and has no children. (*Id.*). He has been dating Ms. Maxsin for approximately 9 months and, prior to being detained, she and Defendant lived together along with her now four year old son from a prior relationship. (*Id.*). Defendant has no known history of drug or alcohol abuse or significant health problems. (*Id.*).

The evidence as to Defendant's employment history is somewhat mixed. It appears that he told Pretrial Services that he was unemployed for a year prior to the hearing but was doing some work "under the table" at a barber shop and assisting his father's business, as needed. (*See Bond Report*). His father's testimony was more favorable than his own report; indicating that Defendant was working four days per week for his business, i.e., almost full time. (Docket No. 625 at 21-23). Mr. Atkins was clear that he would make work available for his son if he was released on bond. (*Id.*).

With that said, Pretrial Services offered no opinion whether Ms. Maxsin's residence would be an appropriate place for Defendant to be released and it appears that no representative of Pretrial Services has made a visit to the home at this point to further investigate the situation and the same would be ordered prior to release of this Defendant to that location. (*See Bond Report*). The Court also has a number of concerns about Ms. Maxsin's ability to act as a third party custodian, as he has suggested, particularly because of: the short length of their relationship of only a few months; the apparent demands of her school work requiring her to be outside the home often during the week; and, the presence of a minor child of no relation to Defendant at the home for whom she expects Defendant will act as a babysitter when needed. In any event, the mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case. *See United States v. Bratcher*, Crim. No. 14-28, 2014 WL 1371582 (W.D. Pa. Apr. 8, 2014) (Conti, C.J.).

The Court is further guided by section 3142(g)(3)(B) which counsels the court to consider "whether, at the time of the current offense or arrest, the person was on probation, on

parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law." Defendant's criminal history, as reported by Pretrial Services, is not as extensive as other individuals who have come before the Court but it includes two prior drug convictions, i.e., guilty pleas to charges of disorderly conduct and possession of a small amount of marijuana in 2012, for which he was fined and court costs were imposed; and, a guilty plea to misdemeanor charge of possession of a controlled substance to which he was sentenced to 6 months' probation on January 28, 2014. (*See Bond Report*). It certainly troubles the Court that Defendant is alleged to have engaged in a heroin trafficking activities including selling heroin to undercover officers at times while he was serving the six month sentence of probation on the state case. (*See id.*; Docket No. 3). Defendant apparently resided with his mother in the Allentown neighborhood of Pittsburgh while serving his probation. (Docket No. 625 at 17-18). Given same, it appears that the influence of Defendant's mother did not have the effect of dissuading him from engaging in drug offenses; rather, Defendant's criminal conduct appears to have escalated after he was sentenced to probation in the state case. This type of behavior suggests a lack of respect for court conditions and undermines Defendant's arguments that he would adhere to any conditions that this Court would impose if he was released on bond, (including with the most restrictive conditions such as home confinement and electronic monitoring).

Accordingly, while the record shows that Defendant has the support of family and friends, potential employment with his father's company and a place to live, such facts are undermined by Defendant's past behavior while subject to court conditions, i.e., the alleged serious misconduct for which he has been indicted in this case. *See* 18 U.S.C. § 3142(g).

*C. Nature and Seriousness of Danger to Any Person or the Community if Released*

The fourth and final factor involves consideration of the defendant's risk of non-appearance and the seriousness of potential harm to any persons or the community. 18 U.S.C. § 3142(g). Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of very dangerous and addictive drugs like heroin. *See United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007) ("violence is not the only danger to the community this court must consider. The court must also consider the danger of trafficking in illicit drugs."); *see United States v. Yarbough*, No. 2:14-CR-270-11, 2014 WL 7343839, at *4 (W.D. Pa. Dec. 23, 2014) (McVerry, J.) ("heroin trafficking represents a substantial danger to the community."). "Schedule I drugs, such as heroin, have 'a high potential for abuse,' 'no currently accepted medical use in treatment in the United States,' and 'a lack of accepted safety' even 'under medical supervision.'" *Burrage v. United States*, 134 S. Ct. 881, 887, 187 L. Ed. 2d 715 (2014) (quoting 21 U.S.C. § 812(b)(1)). Additionally, the Centers for Disease Control and Prevention have cautioned that the number of heroin-related overdose deaths has quadrupled in the past decade (between 2002 and 2013) and that such statistics demonstrate that heroin abuse has become an epidemic problem at the federal, state and local levels. *See Ctr's for Disease Control & Prevention, "Today's Heroin Epidemic: More people at risk, multiple drugs abused,"* (July 2015), *available at*: http://www.cdc.gov/vitalsigns/pdf/2015-07-vitalsigns.pdf (last visited 8/18/15).

The Court also recognizes that the fact that Defendant allegedly engaged in several instances of heroin trafficking while on probation demonstrates that his release on bond would pose a significant risk to his participating in continued criminal activity, including further drug trafficking activities. *See Yarbough*, 2014 WL 7343839, at *4 ("If released to home detention,

13

nothing prevents Defendant from continuing to engage in illegal activity."). Due to his prior disregard of court conditions, it is also doubtful that any conditions imposed by this Court could thwart continued efforts of Defendant to deal in unlawful narcotics. *Id.*

The Court also considers Defendant's challenge to Magistrate Judge Mitchell's finding that the evidence showed that "Defendant evaded arrest after [the] indictment [was] unsealed on May 21, 2015 and knew he was being sought." (Docket No. 512). The Court agrees with the parties that there is no *per se* rule requiring an indicted defendant to immediately turn himself in to authorities or mandating that a defendant who fails to do so must be held in pretrial detention. (Docket Nos. 549, 575, 625). However, courts have found that facts underlying a defendant's voluntary surrender to authorities may support positive inferences in a defendant's favor that he is unlikely to flee and will appear when required in accordance with the terms of release. *See e.g., United States v. Fiandor*, 874 F. Supp. 1358, 1361 (S.D. Fl. Jan. 13, 1995) ("A defendant's voluntary surrender undoubtedly is probative of whether he or she presents a flight risk. Fiandor has offered no explanation, however, of why voluntary surrender also should suggest that a presumptively dangerous person will not threaten public safety upon his or her temporary return to the street."). Yet, this Court cannot make such positive inferences in Defendant's favor on this record and agrees with the Government and Magistrate Judge Mitchell that it is more reasonable to infer from the facts that Defendant was evading or avoiding arrest.

To this end, Defendant – a high school graduate with several prior interactions with the criminal justice system – was aware that he was indicted for around 5 weeks and understood that he was "wanted" by authorities. (Docket No. 625 at 5). His family members and girlfriend were similarly aware of the fact that he – and his brother – were indicted based on public reports

they reviewed in reputable sources including the Pittsburgh Post-Gazette.[5] (*Id.* at 14, 24). At least his father and girlfriend also have prior criminal convictions which they described at the detention hearing, (*id.* at 8, 21), indicating that they necessarily were arrested and/or required to surrender to respond to the charges in those instances. Indeed, Mr. Atkins testified that he served time in prison and at the Renewal Center for a drug offense. (*Id.* at 21). Despite Defendant's awareness of the charges, and the prior experiences with the criminal justice system that both he and his family members have had, Defendant admits that he made no effort to turn himself into authorities. (*Id.* at 5). Rather, Defendant claims that two local criminal defense attorneys separately advised him that he was indicted as part of a federal drug trafficking case without an arrest warrant being issued. (*Id.* at 5, 14-19). Like Magistrate Judge Mitchell, the Court finds this claim specious for a host of reasons.

First, Defendant's girlfriend could not recall many specifics of these alleged conversations, including names of the attorneys with whom they spoke, despite the fact that this was an obvious avenue they were pursuing. (*Id.* at 14-19). Further, Defendant presented no additional corroboration of this claim beyond Ms. Maxsin's vague testimony. (*Id.* at 22-23). Second, Rule 9(a) of the Federal Rules of Criminal Procedure states that the Court <u>must</u> issue a warrant upon the return of an Indictment by the grand jury, absent a request by the Government to issue a summons. *See* FED. R. CRIM. P. 9(a).[6] Third, as soon as the case was unsealed, the public record made clear that warrants to arrest all thirty-eight of the charged defendants were ordered to be issued by Magistrate Judge Cynthia Reed Eddy on May 18, 2015. (Docket Nos. 45, 46). Fourth, the Government's motion to unseal filed on May 21, 2015 stated that "all but

---

[5] The record was not fully developed as to which articles they reviewed that were published in the Post-Gazette. The Court understands, however, that the Indictment was widely reported in local media.

[6] There is no suggestion in this record that a summons may have been issued. In any event, a "summons must be in the same form as a warrant except that it must require the defendant to appear before the court at a stated time and place." FED. R. CRIM. P. 9(b)(2).

two of the defendants are now in custody" and that "[e]fforts have been made and will continue to be made to apprehend the two remaining defendants and they are likely aware of these efforts at this time." (Docket No. 45). Therefore, a docket search conducted after the Indictment was unsealed would have revealed to anyone reviewing the Court's CM/ECF System, including any attorney that Defendant and his girlfriend had contacted, that a warrant had been issued for his arrest on May 18, 2015 and that law enforcement officers were actively seeking to apprehend him. Fifth, Defendant's brother was charged in the same Indictment and although he was in state custody when the Indictment was returned, he was brought into federal custody and appeared before a United States Magistrate Judge on June 10, 2015 or two weeks before Defendant was finally apprehended on June 25, 2015. (*See* Docket Nos. 385-392).

Defendant also appears to argue that the delays in effectuating his arrest were caused not by his own actions but by the failures of the arresting agents, i.e., the United States Marshal Service Fugitive Task Force, to locate and arrest him. (Docket No. 549, 625). Defendant additionally maintains that law enforcement should have known of his whereabouts because they were investigating the case. (*Id.*). This position is untenable because Defendant and his family moved out of the Allentown neighborhood – where he lived at the time of the three controlled buys in the Summer of 2014 – and settled in Crafton Heights, (Docket No. 625 at 17-18), but he did not present any evidence that law enforcement was aware of these facts. Defendant likewise offered no evidence to show that law enforcement knew that he was living with a girlfriend he had not started dating until November of 2014 or that he was working for his father's cleaning business doing jobs at Ulta salons throughout the Greater Pittsburgh area, (*id.* at 17-18, 23).

Finally, beyond these facts, the risk of Defendant's potential to flee from prosecution is heightened due to the substantial penalties he faces if convicted in this case, including a

mandatory minimum sentence of 10 years and up to life imprisonment. *See United States v. Ewell*, Crim. No. 13-125, 2013 WL 4479029, at *3 (W.D. Pa. Aug. 20, 2013) ("The potential for flight from prosecution is now greater as he has been charged with such a serious offense and faces very severe penalties, if convicted."); *see also United States v. Merlino*, No. CRIM.A. 99-363, 1999 WL 557943, at *6 (E.D. Pa. July 30, 1999) ("the fact that the charges carry a mandatory minimum of 10 years imprisonment with a maximum of life provides the defendant with all the incentive he needs to flee this jurisdiction.").

In total, given Defendant's apparent violations of the state court conditions, criminal history indicating an increase in the breadth and scope of his criminal activity resulting in this case and the evidence showing that he was evading or avoiding arrest rather than voluntarily surrendering to authorities, the weight of the evidence is such that the release of Defendant on bond is inappropriate and that his release, on even the most severe restrictions, would pose a serious risk of his continued drug trafficking activities and a substantial risk of non-appearance and/or flight from prosecution. *See* 18 U.S.C. § 3142(g).

### D. Overall Weighing of Relevant Factors

Based on the above findings, the Court affirms the decision of Magistrate Judge Mitchell ordering pretrial detention in this case. (Docket No. 512). The Court also finds that Defendant has not met his burden to rebut the applicable presumption of detention by presenting some credible evidence that he will appear for all court proceedings and not pose a threat to any persons or the community. *See Carbone*, 793 F.2d at 560. The Court further holds that even if Defendant had met his initial burden, the Government's evidence is sufficient to demonstrate by clear and convincing evidence that Defendant is a danger to the community and by a

17

preponderance of the evidence that he is a flight risk. *See Perry*, 788 F.2d at 115. Accordingly, pretrial detention is appropriately ordered based on this record.

V. CONCLUSION

For the foregoing reasons, the Order of Pretrial Detention issued by Magistrate Judge Mitchell on July 6, 2015 [512] is affirmed, and Defendant's Motion [549] is denied to the extent that he seeks reversal of such Order and release on bail. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date: August 18, 2015

cc/ecf: All counsel of record.

Shawn Atkins c/o Jon Pushinsky, Esquire

U.S. Probation Office